SOUTHERN CHRISTIAN LEADER-
SHIP CONFERENCE, LOUISI-
ANA CHAPTER, et al.

v.

SUPREME COURT OF THE
STATE OF LOUISIANA

No. CIV. A. 99–1205.

United States District Court,
E.D. Louisiana.

July 27, 1999.

Mary E. Howell, Howell & Snead, New Orleans, LA, Marjorie Rusth Esman, Marjorie R. Esman, PLC, New Orleans, LA, David Udell, Richard Buery, Brennan Center for Justice, New York City, for plaintiffs.

Christina Berthelot Peck, Roedel, Parsons, Koch, Frost, Balhoff & McCollister, Baton Roughe, LA, Michael H. Rubin, McGlinchey Stafford P.L.L.C., Baton Rouge, LA, for defendant.

Joel R. Waltzer, Waltzer & Associates, New Orleans, LA, for Clinical Legal Educ. Ass'n, amicus.

Lynn Marie Luker, Luker, Sibal and McMurtray, New Orleans, LA, for Louisiana Appleseed, amicus.

### ORDER AND REASONS

FALLON, District Judge.

Before the Court is the Motion of Defendant Louisiana Supreme Court to Dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and for lack of standing.

For the following reasons, the Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) is hereby GRANTED, and the Plaintiffs' Complaint is hereby DISMISSED with prejudice, and with costs.

## BACKGROUND

### A. Factual Overview

In 1971, the Louisiana Supreme Court adopted Rule XX, entitled "Limited Participation of Law Students in Trial Work." *See* La. Sup.Ct. R. XX. Section 1 of the Rule stresses the primary responsibility of the bench and bar for supplying legal services to all persons, including those unable to afford them. Section 1 further declares that the adoption of Rule XX should serve "[a]s one means of providing assistance to clients unable to pay for such services and to encourage law schools to provide clinical instruction in trial work of varying kinds." *Id.* § 1. The Rule permits an eligible law student to appear in court or before administrative tribunals in a representative capacity on behalf of the state, its subdivisions, or any indigent person. *See id.* § 3. The Louisiana Supreme Court amended the original rule in 1988 to include student representation of indigent community organizations.

Over the years several law school sponsored clinics, including the Tulane Environmental Law Clinic ("TELC"), have supplied legal advice and representation to various indigent community organizations. According to the Plaintiffs' Complaint, sometime around November 1996 Plaintiff St. James Citizens for Jobs & the Environment ("St.James") sought TELC's assistance in opposing the construction of a polyvinyl chloride and ethylene dichloride production facility by Shintech in the St. James Parish town of Convent. *See* Pls.' Compl., ¶ 23. St. James opposed the plant's location on the grounds that, as a small, lower income and predominantly African–American community, Convent was already host to a disproportionate share of chemical facilities posing risks to both the environment and to the health of local inhabitants. St. James avers that it was unable to secure legal representation in its fight against Shintech from any source other than TELC.

TELC appeared at hearings on behalf of St. James and some of the other Plaintiffs to this suit, and opposed the Shintech project. After the Louisiana Department of Environmental Quality ("LDEQ") submitted proposed air permits for the plant, TELC filed objections to them with the U.S. Environmental Protection Agency ("EPA"). In April 1997, EPA instructed LDEQ to reevaluate the proposals in light of the environmental justice concerns raised by TELC on behalf of its clients. *See id.* ¶ 26. TELC then filed additional objections, contending that the air permits violated a Presidential Executive Order on environmental justice as well as Title VI of the Civil Rights Act of 1964. Shintech eventually decided to locate elsewhere.

Plaintiffs allege that TELC's successful advocacy "provoked intense criticism and retribution" from business and political leaders around Louisiana. *See id.* ¶ 28. They further assert that the Governor, citing concerns that TELC and other groups like it were discouraging business investment in Louisiana, mounted an aggressive campaign aimed at galvanizing business interests to exert pressure on Tulane University to reign in the clinic. *See id.* ¶¶ 28–29. In turn, these business groups sent a series of letters to the Louisiana Supreme Court, complaining about TELC's activities and asking for tighter regulation of student practice. *See id.* ¶¶ 30–40. After conducting an investigation, the Supreme Court on June 17, 1998 amended Rule XX to impose additional regulations on the operation of student clinics throughout the State. Rule XX was thereafter amended on two occasions, and on March 22, 1999, the Louisiana Supreme Court published the latest version, which became effective April 15, 1999, and is the primary focus of this lawsuit.

The Rule as finally amended provides in relevant part:

Section 4. Standard for Determining Eligibility for Representation. Law School clinical program staff and student practitioners who appear in a representative capacity pursuant to this rule may represent any individual or family unit whose annual income does not exceed 200% of the federal poverty guidelines established by the Department of Health and Human Services. These guidelines need not be applied when the client is court-appointed or court-referred and the appointing or referring court has reviewed the economic condition of the client and has determined that the client is indigent.

Section 5. Representation of Indigent Community Organizations. Any indigent community organization that wishes to obtain representation pursuant to this rule must certify in writing to the inability to pay for legal services. The written certification shall be subject to inspection by the Supreme Court of Louisiana.

Law school clinical program staff and student practitioners who appear in a representative capacity pursuant to this rule may represent any indigent community organization provided at least 51% of the organization's members are eligible for legal assistance pursuant to Section 4 of this rule. The indigent community organization shall also provide information to clinic staff which shows that the organization lacks, and has no practical means of obtaining, funds to retain private counsel.

Section 7. The certification of a student by the law school dean ... (c) May be terminated by this court at any time without notice or hearing and without any showing of cause.

Section 10. Lawyer staffpersons of law school clinical programs and certified student practitioners shall adhere to the Rules of Professional Conduct, including the rules prohibiting solicitation of cases or clients. In addition, no student practitioner shall appear in a representative capacity pursuant to this rule if any clinical program supervising lawyer, staffperson, or student practitioner initiated in-person contact, or contact by mail, telephone or other communications medium, with an indigent person or indigent community organization for the purpose of representing the contacted person or organization.

Section 12. Nothing contained in this rule shall affect the right of any person who is not admitted to practice law to do anything that he/she might lawfully do prior to the adoption of this rule.

La. Sup.Ct. R. XX.

## B. Procedural History

### 1. Plaintiffs' Complaint

On April 16, 1999 Plaintiffs instituted this suit pursuant to 42 U.S.C. § 1983, styled as "an action to preserve access to legal representation for individuals and community organizations in Louisiana who seek to enforce public laws and advance the public good, but who cannot afford to retain private counsel." Pls.' Compl., ¶ 1. Plaintiffs comprise twenty-one separate parties, including ten community organizations allegedly in need of law clinic representation ("client-plaintiffs"), five law school professors who are licensed attorneys and act as clinic instructors ("professor-plaintiffs"), two student groups and three individual students claiming direct interests in clinical education programs ("student-plaintiffs"), and one private, individual donor of funds to TELC ("donor-plaintiff"). Plaintiffs name the Louisiana Supreme Court as sole Defendant and seek declaratory and injunctive relief, asking this Court to declare the amendments to Rule XX unconstitutional under both the United States Constitution and the Constitution of the State of Louisiana.

In their Complaint, Plaintiffs list eight specific bases for the relief sought by asserting that the Rule XX Amendments: 1)

constitute impermissible viewpoint discrimination in violation of both the First Amendment of the United States Constitution and Article I, Section 7 of the Louisiana Constitution; 2) violate Equal Protection under the Fourteenth Amendment as well as Article I, Section 3 of the Louisiana Constitution by discriminating against Plaintiffs on the basis of their political views; 3) infringe Plaintiffs' rights of freedom of speech, association, and to petition government for redress of grievances under the First Amendment and Louisiana Constitution, by placing restrictions on student solicitation of clients and cases (Rule XX, Section 10); 4) impinge on the academic freedom of professors and students in contravention of the First and Fourteenth Amendments and Article I, Sections 7, 9, and 23 of the Louisiana Constitution by imposing the newer, more restrictive income requirements potential clients must meet in order to qualify for representation (Rule XX, Sections 4 and 5); 5) violate the First and Fourteenth Amendments in addition to Article I, Sections 7, 9, and 22 of the Louisiana Constitution because the new income guidelines and allegedly intrusive verification procedures suppress Plaintiffs' freedom of speech, freedom of association, and right to petition government for redress of grievances (Rule. XX, Section 5); 6) are unconstitutionally vague and overbroad in that the financial disclosure and certification requirements contained in Rule XX, Section 5 provide insufficient guidance on how to comply, thereby violating the rights of the clients, students, and professors under the First and Fourteenth Amendments and Article I, Section 7 of the Louisiana Constitution; 7) violate the donor's rights to freedom of speech and association to advance his beliefs by contributing funds, contrary to the First and Fourteenth Amendments and to Article I, Sections 7, 9, and 22 of the Louisiana Constitution; and 8) violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment as well as Article I, Section 2 of the Louisiana Constitution by virtue of the arbitrary and capricious manner in which the Rule XX Amendments were adopted, depriving them of fundamental rights without fair notice or any opportunity to be heard.

Plaintiffs ask this Court to declare the Rule XX Amendments unconstitutional, and grant preliminary and permanent injunctive relief against their enforcement and against any disciplinary action by Defendant against any Plaintiff or other attorney based on the Amendments. Plaintiffs also seek an injunction directing Defendant to reinstate Rule XX as it existed prior to the 1998 and 1999 Amendments. Finally, Plaintiffs pray for costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

## 2. Defendant's Motions

The Louisiana Supreme Court filed two motions on May 26, 1999, asking this Court to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively for lack of standing, and to grant a stay of discovery pending the Court's ruling on the Motion to Dismiss. At oral argument on July 21, 1999, this Court granted the Motion to Stay Discovery pending a ruling on the Motion to Dismiss, reserving to the parties their right to reurge any discovery matters after such ruling.

In its Motion to Dismiss, Defendant takes the position that Plaintiffs state no colorable cause of action since there exists no statutory or constitutional right of a nonlawyer to represent individuals or organizations, nor is there any right of a litigant to legal representation in civil cases. Defendant views the Complaint as an attempt by the Plaintiffs to establish a rule giving nonlawyers unilateral permission to solicit clients and to appear in court and assert the rights of others.

Defendant further maintains that this Court lacks jurisdiction over Plaintiffs' asserted violations of the Louisiana Constitu-

tion, as the Eleventh Amendment to the United States Constitution operates to bar state law claims against a nonconsenting state in federal court. Defendant then attacks the standing of each group of Plaintiffs to prosecute this suit, arguing that the absence of the predicate rights to nonlawyer representation or to legal counsel in a civil case prevents them from pleading any injury sufficient to establish standing under the United States Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Defendant seeks dismissal of the case at Plaintiffs' cost.

### 3. Plaintiffs' Response

Plaintiffs' filed their opposition on July 13, 1999, contending that both motions should be denied. As for the Motion to Dismiss, Plaintiffs maintain that it completely misconstrues the theory underlying their Complaint. They insist that this case is not about recognizing a constitutional right for nonlawyers to represent clients, or about creating a similar right of litigants to civil representation. At the core of this dispute, rather, is the Louisiana Supreme Court's exercise of its power to regulate the legal profession in an unconstitutional manner. Plaintiffs attest that the ability to represent others is amenable to First Amendment protection, and that, under the standard of review for a Rule 12(b)(6) motion, dismissal is inappropriate where a party has made claims such as viewpoint discrimination or impingement of free speech, which raise inherently factual issues.

### *ANALYSIS*

### A. Standard of Review

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept all material allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Garrett v. Commonwealth Mortgage*

*Corp. of America*, 938 F.2d 591, 593 (5th Cir.1991). Dismissal is not appropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hernandez v. Maxwell*, 905 F.2d 94, 96 (5th Cir.1990). In making this determination, the Fifth Circuit has stated that it is inappropriate to go beyond the face of the pleadings. *See id.*

In analyzing a suit instituted under 42 U.S.C. § 1983 in the context of a Rule 12(b)(6) motion, the initial inquiry is "whether the complaint properly sets forth a claim of a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States caused by persons acting under color of state law." *Fontana v. Barham*, 707 F.2d 221, 225 (5th Cir.1983). A court must focus on the plaintiff's complaint, the nature of the purported protected interest, and the nature of the alleged deprivation. *See id.* Failure of the complaint to set forth a deprivation of a protected interest warrants dismissal of the case. *See id.* Section 1983 does not "open[ ] the federal courthouse doors to relieve the complaints of all who suffer injury at the hands of the state or its officers." *Id.* (quoting *White v. Thomas*, 660 F.2d 680, 683 (5th Cir.1981)).

This Court's focus, then, should be on whether the Plaintiffs allege the deprivation of interests protected by the Constitution or other laws of the United States. If the Complaint cannot satisfy this threshold showing, dismissal is appropriate.

### B. The Eleventh Amendment Bars Plaintiffs' State Law Claims

█ The Defendant takes the position that the Eleventh Amendment to the United States Constitution prohibits Plaintiffs from seeking in federal court a declaration that the Rule XX Amendments violate the Louisiana Constitution. The United States Supreme Court has pronounced the basic maxim that, under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts

by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[1] The U.S. Supreme Court has elaborated on this doctrine in a series of cases, the most relevant for purposes of this dispute being *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

In *Pennhurst,* the Supreme Court reiterated its position that the Eleventh Amendment's jurisdictional bar to suit against a state or one of its agencies in federal court applies regardless of the relief sought. *See id.* at 100, 104 S.Ct. 900. The Court then extended this rule by concluding that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when ... the relief sought and ordered has an impact directly on the State itself." *Id.* at 117, 104 S.Ct. 900. The decision determined that this principle controls even state law claims brought into federal court under pendent jurisdiction. *See id.* at 121, 104 S.Ct. 900.

The Fifth Circuit has previously recognized that the Louisiana State Bar Association is an agent of the Louisiana Supreme Court and that it may therefore invoke Eleventh Amendment protection. *See Lewis v. Louisiana State Bar Ass'n,* 792 F.2d 493, 497 (5th Cir.1986). By implication, similar relief is available to the Louisiana Supreme Court itself. *See id.* at 497–98.

Plaintiffs urge *Word of Faith World Outreach Ctr. Church, Inc. v. Morales,* 986 F.2d 962 (5th Cir.1993), for the proposition that "*Pennhurst* does not affect a federal court's jurisdiction to determine whether state officials have violated state law when such a determination is a necessary antecedent to resolving the merits of a federal law claim." Pls.' Mem. Opp'n, at 44.

They contend that since violations of state law form the basis of their federal claims, and because they are seeking to enforce federal law, *Pennhurst* does not apply to this action. *See id.*

In *Word of Faith,* the Fifth Circuit refused to find an Eleventh Amendment prohibition to federal jurisdiction because the Texas Attorney General had acted beyond the scope of the authority conferred on him by state law, thereby rendering himself subject to suit in his individual capacity. *See* 986 F.2d at 965–66. The panel noted, however, that this holding was not inconsistent with *Pennhurst,* since in that case there was no allegation that the state officers in question were acting in other than their official capacities. *See id.* at 966. The opinion added that nothing in *Pennhurst* prevents a federal court from construing state law to divine whether or not an official is exceeding his or her authority. *See id.* Thus the cases draw a distinction between a federal court construing state law to determine whether a state official has acted in either an individual or official capacity, and actually entertaining a lawsuit against a state in which state law claims form the basis of the complaint.

■ The command of *Pennhurst* seems clearly applicable to this dispute. Plaintiffs' allegations that Rule XX in its current form violates the Louisiana Constitution are purely state law claims, lodged against a state entity that is entitled to invoke the Eleventh Amendment. While this Court agrees with Plaintiffs that *Pennhurst* does not preclude a separate determination that Rule XX violates the United States Constitution, finding a contravention of Louisiana's Constitution is not a "necessary antecedent" to resolving the federal claims raised here. To the extent that this Court finds it necessary to construe state law to ascertain whether

---

1. The Eleventh Amendment does not, however, bar a federal court from granting prospective injunctive relief against state officials whose enforcement of particular laws would

violate the Fourteenth Amendment. *See id.* at 664, 94 S.Ct. 1347 (discussing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

violations of federal law have occurred, it possesses the inherent power to do so without the prerequisite that the Complaint contain specific state law allegations. *Pennhurst* controls this case, and Plaintiffs' state law claims must be dismissed as jurisdictionally barred. *See generally Alden v. Maine,* —— U.S. ——, 119 S.Ct. 2240, —— L.Ed.2d —— (1999) (recognizing the States' immunity from suit as a fundamental aspect of sovereign immunity protected by the Constitution).

## C. The Complaint Fails to State the Deprivation of Any Cognizable Federal Right

The Complaint contains allegations that Rule XX in its current form deprives the Plaintiffs of their federal constitutional rights. In essence, Plaintiffs express two concerns, objecting both to the income criteria for determining which individuals or organizations qualify for clinic representation, and to the restrictions placed on students appearing in a representative capacity on behalf of solicited clients. Because the Plaintiffs in this case are comprised of four discrete groups, it is helpful to examine each category's claims separately to determine whether any state a cause of action.

### 1. The Client–Plaintiffs

The first group of complainants are the ten community organizations asserting that the new clinic regulations violate their constitutional rights by depriving them of the ability to speak, associate, and petition government freely, without fear of harassment or discrimination on the basis of their viewpoint. These groups also maintain that the income guidelines imposed by Rule XX infringe on their protected right to collective activity by compelling the disclosure of sensitive, private financial information that could expose their members to retaliation. They assert that application of the income criteria will force them to segregate their members along economic lines, further abridging their freedom of association.

The Defendant argues that, at bottom, the client-plaintiffs' claim is that "individuals and organizations have a right to have representation in civil matters." Def.'s Mem. Supp. Mot. Dismiss, at 22. Because no such right exists, the client-plaintiffs lack a critical predicate to stating the deprivation of a protected interest sufficient to survive a Rule 12(b)(6) motion. *See id.* at 23.

Plaintiffs' response is that their objections address the deprivation of fundamental constitutional rights which are independent of any right to counsel. Rule XX operates to restrict these rights and is therefore unconstitutional regardless of the existence of an antecedent right to representation in civil matters. *See* Pls.' Mem. Opp'n, at 5–8.

■ The parties appear to agree, and the law is clear, that there is no constitutional right to legal representation in a civil case. *See Bass v. Perrin,* 170 F.3d 1312, 1320 (11th Cir.1999); *United States v. Sardone,* 94 F.3d 1233, 1236 (9th Cir. 1996). Under U.S. Supreme Court jurisprudence, "[t]he pre-eminent generalization that emerges ... on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." *Lassiter v. Department of Soc. Servs. of Durham County, N.C.,* 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). "It is against this presumption that all the other elements in the due process decision must be measured." *Id.* at 27, 101 S.Ct. 2153. The Fifth Circuit has explained this rule to mean that there is no Sixth Amendment right to appointment or effective assistance of counsel in a civil case. *See Salmon v. Corpus Christi Indep. Sch. Dist.,* 911 F.2d 1165, 1166 (5th Cir.1990); *Sanchez v. United States Postal Serv.,* 785 F.2d 1236, 1237 (5th Cir.1986).

■ Even in the criminal context, there are limits on the type of legal assistance an indigent may obtain. For example, in recognizing a fundamental right of access to courts for prison inmates, the U.S. Supreme Court has cautioned that acknowledgment of a prisoner's right to adequate legal resources for pursuing redress to actual harms "did not create an abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus even in the case of prisoners, no right to legal assistance, let alone counsel, exists without some concrete, particularized injury. *See id.* at 351–52, 116 S.Ct. 2174.

The significance of *Lewis* is that, even where there is a generally recognized constitutional right to legal assistance, that entitlement remains subject to certain constraints. In view of the sort of burdens on legal aid to prisoners allowed by the Supreme Court, it is difficult to see how rules which may incidentally erect boundaries to the availability of civil representation can give rise to constitutional claims, especially when no right to civil representation exists in the first instance.

The Plaintiffs rely on cases such as *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), and *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), for the proposition that representation of public interest groups organized for the purpose of collective political expression is amenable to First Amendment protection. While those decisions indeed buttress such a contention, they are distinguishable from this case. In those disputes, the government regulations at issue operated directly on the community organizations themselves, or on any and all licensed attorneys who were employed, associated, or otherwise regularly affiliated with those groups. Regulation of the groups' lawyers thus placed a direct restraint on the *right*, as well as the ability, of those organizations to advance the causes for which they were formed.

■ Here we confront the regulation of nonlawyers who are not directly employed, associated, or otherwise affiliated with the client-plaintiffs. The only connection alleged between the clinics and the client-plaintiffs is a history of past representation and a desire for future representation. Any licensed attorneys, including the clinics' law professors, whom the client-plaintiffs hire, or who volunteer their services to the client-plaintiffs, would not be limited by Rule XX in any fashion with regard to the scope of their advocacy. The organizations in this suit remain free to act in any way they choose, unburdened by the strictures of Rule XX, whereas the groups or lawyers in *Primus* and *Button* found themselves legally barred from certain activities no matter who carried out the representation. To the extent that the amendments might affect the client-plaintiffs' expressive activities, they only impact the community organizations' preferred *channel* for advocating, as opposed to their *right* to do so. Although the Plaintiffs surely feel otherwise, this Court is of the view that this distinction matters from a constitutional standpoint.

The client-plaintiffs argue that this reasoning rings hollow, since they cannot effectively exercise their rights without law clinic representation due to their inability to secure legal services from any other source. In essence, the client-plaintiffs' complaint is that the manner in which Rule XX constricts the operation of law clinics interferes with their ability to exercise their constitutional rights in a legal forum. One cannot exercise rights in a legal forum without representation by counsel. This purported intrusion upon the client-plaintiffs' rights, then, necessarily presupposes a right to representation in the civil context. Here, the civil representation at issue is that provided by the students in the law clinics. As the cases cited earlier

demonstrate, no such right exists in civil cases.

Without a predicate right to representation in civil cases, the essential bridge to stating a claim that regulation of the clinics burdens the client-plaintiffs' constitutional rights collapses. Rule XX does not operate upon the client-plaintiffs at all unless they voluntarily seek to engage the services of ·TELC or its brethren. Under no set of facts can these community organizations establish that Rule XX impinges a legally protected interest, so that they fail to state a claim under 42 U.S.C. § 1983. Their claims, therefore, must be dismissed.

### 2. The Donor–Plaintiff

This category consists of one individual Plaintiff who asserts that Rule XX implicates his constitutional rights due to the manner in which the new conditions imposed on the clinics dictate how they spend the private funds he contributes. He insists that the Amendments interfere with the independent pedagogic judgment of the clinic professors and limit their freedom to advance the causes he intends to support. In this way, Rule XX impinges on the donor-plaintiff's own constitutional right to express and advance his beliefs.

Defendant asserts that the donor-plaintiff's claim must be dismissed because of his failure to demonstrate standing. The suggestion that Rule XX controls the use of private funds is unsupportable because the rule applies instead to the conduct of nonlawyer representation in Louisiana courts. Moreover, the donor-plaintiff's purported injury is too theoretical to establish standing under U.S. Supreme Court precedents.

Among other authorities, Plaintiffs cite *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality opinion), for the proposition that government "may not restrict or coercively discourage speech simply because it involves the expenditure of money." Pls.' Mem.

Opp'n, at 38. The Plaintiffs' brief in this area relies on several decisions dealing with the question of government regulation of political campaign contributions and expenditures as a burden on First Amendment rights. Presumably their argument is that the donor-plaintiff's situation is analogous to that of a contributor to a political ·campaign.

■ On its face, Rule XX nowhere imposes any limit on the amount of funds an individual or organization may contribute to law school clinics, nor does it prescribe how such donations may be spent. The argument is that, though facially neutral, the Amendments have the effect of dictating how the clinics utilize the private funds they receive, thereby curtailing the scope of expression the donor-plaintiff seeks to achieve through his contributions. Even assuming as true the Plaintiffs' contention that the application of Rule XX burdens the expenditure of private funds for political expression, the case law does not support the notion that this automatically rises to an unconstitutional constraint on a donor's speech or expression. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (upholding limits on the amount that any one person or group may contribute).

Plaintiffs' position also seems to be that the burden at issue is not the imposition of a particular spending limit, but the way in which Rule XX controls how funds are spent. Nothing in Rule XX prohibits the donor-plaintiff from contributing funds directly to the community organizations he seeks to support, however. He is free to distribute and condition the use of money to them in any way he desires, preserving his right to express himself through donations, to the degree such a right even exists. At most, the donor-plaintiff's objection is that Rule XX restricts his ability to channel funds to their ultimate recipients, the community groups, in the manner he sees fit.

This Court does not read any of the cases cited by Plaintiffs to stand for the proposition that a donor has a constitutional right to demand that funds he supplies be expended in a certain way, particularly when the complained of regulation burdens the conduit (i.e., TELC), and not the ultimate recipient, of the donation, and when the donor remains completely free to provide funds directly to the beneficiary in any amount and under any conditions he deems appropriate.

Even if Rule XX, which on its face does not mention financial donations, somehow implicated a right to contribute, this Court fails to see how the donor-plaintiff can show that the Rule constrains that interest, since he remains free to exercise this right through direct donations to the community groups themselves. The donor-plaintiff's grievance is not cognizable under 42 U.S.C. § 1983, and his claims must be dismissed.

### 3. The Professor–Plaintiffs

The law faculty's complaint is that Rule XX inhibits their ability to recruit clients for, and engage students in, the types of cases which afford the best possible teaching and learning opportunities. They insist that this burdens their constitutional rights to freedom of association with students, freedom of speech, and academic freedom.

The Defendant attacks the faculty's standing to raise such claims. It takes the position that they do not allege a particularized injury or invasion of any legally protected interest, since nothing in Rule XX controls their actions inside or outside the classroom. They remain free to speak or associate in any way they see fit and in any forum they desire. In essence, Defendant's response is that the Amendments have no impact on how the professors themselves, as licensed attorneys, practice law or advocate for clients of their own choosing.

The professor-plaintiffs rely on, among others, cases such as *Edwards v. Aguil-lard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), and *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), for the proposition that courts apply exacting scrutiny to legislative attempts to "interfere with the ability of teachers to educate in the manner they deem appropriate." Pls.' Mem. Opp'n, at 23. Those cases, however, involved legislative actions, laws, or other government policies which, in one fashion or another, directly regulated the operation of the academic institutions concerned. Here Rule·XX does not operate directly on the schools themselves, but indirectly by controlling what law students are permitted to do outside the classroom, as part of clinical training. Plaintiffs undoubtedly feel this is another distinction without a difference, but the critical contrast is that in many of cases cited, government was requiring schools to do certain things, while in this situation the Amendments simply place limits on what students can do under certain narrowly defined circumstances.

■ The Court is of the opinion that, at its core, the professor-plaintiffs' grievance is that the Amendments deprive them of the freedom to instruct and employ law students in whatever fashion they desire. The professor-plaintiffs are not complaining that Rule XX impinges their own right to espouse any theory or advocate any idea in the classroom, but that it intrudes upon a derivative right, one drawn from the supposed freedom of law students to obtain a clinical education in the manner that is most pedagogically beneficial. Maximizing the academic experience is certainly a laudable goal and is the very cornerstone of higher education, but this lofty aim is nevertheless subject to legitimate societal boundaries.

From an incremental·perspective, the professor-plaintiffs' argument involves three steps. First, the faculty assert a free speech right to tell students how they should practice, implying that any limita-

tions on this right constitute impermissible government interference. Second, they posit a right to show or demonstrate to law students how to practice law, further suggesting that any curtailment of this freedom automatically violates the principle of academic freedom. Finally, the professor-plaintiffs want their students to learn by doing, and when government impedes the faculty from accomplishing this objective in the manner they deem most appropriate, by placing limits on what the faculty can permit students to do, it has infringed the faculty's constitutional right to teach freely.

Taken to its logical conclusion, the right the faculty implores this Court to recognize is one that bestows upon professors unfettered discretion to instruct students, not only in the classroom but also in the "real-world" context, in whatever manner they choose so long as the professors feel it is the most pedagogically beneficial. Under this theory, a professor supervising a criminal law clinic might determine that the best educational experience for students would be to first learn how it feels to be a criminal and to spend time incarcerated. If the Louisiana Supreme Court then amended Rule XX to prohibit student practitioners from any activity that might constitute a crime, this would automatically burden the professors' constitutional rights. While this may actually be true in a purely theoretical sense, it is clear that the State could constitutionally proscribe such behavior. In this case, the Rule XX Amendments more narrowly define the students' already limited privilege to engage in what would otherwise be the unauthorized practice of law. To place restrictions on such a privilege burdens the professors' rights no more than the above hypothetical proscription against criminal law clinic students engaging in criminal activity.

In short, Rule XX does not prohibit the professor-plaintiffs from representing or soliciting whomever they wish, or from employing students in any *non* representa-

tive capacity they desire, just as any licensed attorney would rely on a student law clerk or paralegal. If it is within the province of the Louisiana Supreme Court to erect boundaries to student practitioners' authority to appear in court, then it is also appropriate for the same limitations to govern how professors direct those students. This Court cannot discern any cognizable injury wrought upon the professor-plaintiffs by Rule XX, and their claims must be dismissed.

### 4. The Student- and Student–Organization Plaintiffs

The students and student organizations object that Rule XX infringes their constitutional rights because it detracts from their educational opportunities and burdens their ability to associate and advocate for expression of collective views. Because the new Amendments deprive them of a critical aspect of clinical legal training, the student-plaintiffs maintain that they have suffered a concrete, particularized injury to a protected interest.

Defendant argues that the students cannot state a constitutional claim because there is no predicate right of a nonlawyer to practice law. Law students enjoy no constitutional right to represent others in court, and the Louisiana Supreme Court can impose restrictions on their ability to practice without implicating fundamental freedoms. As for the student organizations, Defendant's reasoning is that they lack standing to assert a right, on behalf of the students, that does not even exist in the first instance.

The Plaintiffs do not contest the propositions that there exists no fundamental right of a nonlawyer to practice law, and that courts possess the inherent power to regulate both lawyers and clinical law student practice. *See* Pls.' Mem. Opp'n, at 5; *see also Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 43 (5th Cir.1992); *Ex parte Steckler*, 179 La. 410, 154 So. 41, 44–45 (1934); *Drew v. Unauthorized Practice of Law Comm.*, 970 S.W.2d 152, 155 (Tex.

App.1998). The natural corollary of this rule is that nonlawyer students may practice only with the permission of the Louisiana Supreme Court, and then only under the guidelines promulgated by that tribunal. The students insist, however, that the Louisiana Supreme Court may not regulate their ability to practice in ways that violate the United States Constitution.

■ One of the Plaintiffs' arguments addresses the manner in which Rule XX uses the federal poverty guidelines to place restrictions on who the clinics may represent. Section 4 dictates that lawyer staff persons and students appearing in a representative capacity may "represent any individual or family unit whose annual income does not exceed 200% of the federal poverty guidelines established by the Department of Health and Human Services." Sup.Ct. R. XX § 4. The complaint is that this ceiling, coupled with the restrictions contained in Section 5, forces the clinics to decline representation of certain, otherwise qualified groups on the basis of their income. In short, the students complain that this provision prevents them from representing more affluent individuals or organizations.

Courts routinely uphold the utilization of income levels as criteria for conditioning certain public benefits. *See, e.g., Downhour v. Somani*, 85 F.3d 261, 270 (6th Cir. 1996) (validating state statute which used 600% of federal poverty guidelines as the basis for determining whether or not it was permissible to balance bill groups of Medicare recipients). Significantly, *Downhour* also held that, at least under the circumstances of that dispute, "the constitutional right to privacy does not extend to protect the plaintiffs' desire not to disclose their private financial information." *Id.* The U.S. Supreme Court has further stated that, "at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 24, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The use of these very same federal poverty guidelines by the Legal Services Corporation ("LSC") to determine eligibility for free legal services for the poor is standard practice, and the Second Circuit has found that subsequent Congressional restrictions on lobbying activities by LSC did not discriminate against speech on the basis of viewpoint. *See Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 767–68 (2d Cir.1999).

Plaintiffs' rejoinder is that all of these decisions somehow involved the use of public funds. The clinics receive only private funds, so that their situation is distinguishable. Upon closer review, this distinction is not so great. Although the Louisiana Supreme Court does not offer public funding for legal services for the poor, through the mechanism of Rule XX it does supply "labor" for the provision of legal services to the poor. By allowing students to represent indigents, the State is essentially offering free assistance through the students themselves, rather than through public funds. By analogy, then, the State should be permitted to employ the same guidelines for determining who will receive these limited public resources. This is especially true in the present case, where the income guidelines adopted by Rule XX are in fact more generous than those used by LSC itself. While the maximum annual income level for representation under LSC rules is 125% of the federal poverty guidelines, Rule XX sets a limit of 200%. *See* La. Sup.Ct. R. XX § 4 cmt. (1999). This in spite of the fact that, according to the amicus curiae brief filed by Louisiana Appleseed, Louisiana ranked forty-seventh in the nation in personal income in 1989. *See* La. Appleseed Amicus Brf., at 4. Consistency would seem to require that income guidelines be structured to ensure that the poorest of the poor have their needs met before permitting those in less dire circumstances to receive free aid. When viewed from this perspective, the new burdens placed on student representation does not seem egregious.

From its inception in 1971, the purpose of Rule XX has been similar to the role envisioned for LSC: to provide legal services to the indigent, while simultaneously affording students enhanced educational opportunities. Thus Rule XX has always had a public service orientation, one geared towards supplying needed legal services to those least able to pay for them. Without any income criteria whatsoever for determining who might qualify for aid, it is conceivable that the poor themselves might not receive any legal assistance. The amicus briefs indicate that the poorest of the poor in Louisiana are not having their legal needs met. *See id.* at 5–8. To the extent that student practitioners seek to use their time and resources offering assistance to clients whose income exceeds 200% of the federal poverty guidelines, they further deprive the very poorest people in Louisiana of an opportunity for legal representation. Income restrictions are not an improper method for conditioning the availability of free legal services, since they are consistent with the original purpose of Rule XX. In light of the foregoing, it seems quite a stretch to suggest, as Plaintiffs do, that use of income guidelines to condition a benefit somehow violate freedom of speech or association.

■ Another of the students' primary objections to Rule XX involves Section 10, which imposes restrictions on their ability to solicit potential clients, and on their freedom to appear in a representative capacity on behalf of clients whom clinic lawyers or staffpersons have solicited. *See* La. Sup.Ct. R. XX § 10. At the outset it is important to note that the Louisiana Supreme Court possesses " 'exclusive and plenary power to define and regulate all facets of the practice of law, including ... the client-attorney relationship.' " *Dodson,* 951 F.2d at 43 (quoting *Succession of Wallace,* 574 So.2d 348, 350 (La.1991)). This authority necessarily must encompass appropriate regulation of the solicitation of clients. Indeed, this Court cannot con-

ceive of many functions closer to the core of the Louisiana Supreme Court's responsibilities to the bar than the regulation of solicitation, an area pregnant with concerns for protection of the public and the appropriate conduct of attorneys. While free speech rights do exist in this area, they are precariously perched when balanced against the imperatives of protecting the public and monitoring professional ethics. Particularly where student solicitation of potential clients is involved, concern for protecting the public grows considerably.

The Commentary to Section 10 indicates that the Louisiana Supreme Court was concerned with the possibility that future attorneys' first experience with solicitation might occur in the law school setting, during their embryonic stage, before they have had the opportunity to mature into full-time, practicing lawyers. *See* La. Sup. Ct. R. XX § 10 cmt. (1999). This is a legitimate state interest and a proper matter for the Supreme Court to address. There are also legitimate concerns that students engaged in solicitation might unintentionally mislead or oversell clinic services to the public. It is significant that the only restriction placed on solicitation by licensed clinic attorneys is that students would not be permitted to appear in a representative capacity in such cases. This leaves the door open for students to participate in solicited cases in other fashions, and to become fully involved, including in a representative capacity, in cases that the clinics have not solicited. Finally, the Commentary notes that the Rule is not designed to "in any way restrict or prohibit law school clinical activities which are intended to provide education or information to Louisiana citizens." *Id.* In short, this Court is of the opinion that Section 10 does not implicate the students' constitutional freedoms due to the Louisiana Supreme Court's inherent power to regulate student practice, and even if it did, the Court believes that Section 10 strikes the proper balance between the government and individual interests at stake. It is rationally related to a legitimate state in-

terest. *See generally City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

## D. Summary

This Court is aware that it is considering a 12(b)(6) motion. The burden on the movant in such a motion is heavy. Nevertheless, failure of a complaint to set forth a deprivation of a protective interest compels its dismissal. Nonlawyers have no constitutional or legal right to represent individuals or organizations in courts or before administrative tribunals. Rule XX authorizes law students in clinics to do so on a limited basis. The limitations are rationally related to legitimate state interests. They are an appropriate exercise of the Supreme Court's duty, responsibility and power. There is no protective interest and thus there can be no deprivation.

Once the rhetoric has been stripped away from this dispute, what essentially remains is the Plaintiffs' assertion that the change in Rule XX was precipitated by political pressure, and was not based on any improper conduct on the clinics' part. The Plaintiffs allege that this political pressure took the form of letters and public comments directed at the Louisiana Supreme Court Justices during an election campaign, and point to the close temporal relationship between the business community's expressions of outrage and the subsequent changes to Rule XX. This may well raise an issue in need of closer examination and debate, but the forum for addressing such questions is more properly a political, not a judicial, one. According to Justice Douglas, the Constitution may not be used to strike down state action because it is unwise, improvident, or out of harmony with a particular school of thought. *See Williamson,* 348 U.S. at 488, 75 S.Ct. 461.

Plaintiffs have not alleged purposeful discrimination against a suspect or quasi-suspect classification. The only classification they invoke is based on income, to which the U.S. Supreme Court applies rational basis review. *See San Antonio Indep. Sch. Dist.,* 411 U.S. at 28–29, 93 S.Ct. 1278. Heightened scrutiny is therefore not triggered here unless a fundamental right is at stake. As this Court has stated, no such rights are implicated in this case.

Consequently, the Louisiana Supreme Court's actions were not illegal or unconstitutional, and if they were precipitated by some otherwise nondiscriminatory political motive, such motivation by itself does not automatically equate to an unconstitutional or even an improper motive, nor does it transform a constitutional exercise of authority into an unconstitutional one. If this were possible, then the reverse would also have to be true: an unconstitutional act could be metamorphosed into a constitutional one by the mere presence of a pure, nondiscriminatory motive. Cherished freedoms, such as freedom of speech, press and religion, could be jeopardized by the actions of a well-meaning, beneficent despot. This proposition is most assuredly incorrect. Furthermore, in Louisiana, where state judges are elected, one cannot claim complete surprise when political pressure somehow manifests itself within the judiciary.

The aim of the law clinics and the dedication of their staffs and students are indeed laudable. They should be commended for their enthusiasm, hard work, and willingness to devote time and effort toward altruistic endeavors. The Court recognizes the pronounced degree of anger, angst, and frustration they are experiencing as a result of this alteration in the practice rules. To them, such a change appears unfair. However, unfairness does not always automatically rise to the level of unconstitutionality. Indeed, it rarely does. The connection between these two concepts that the Plaintiffs seek to draw simply does not exist in this case. Their energies would more properly be focused on the political rather than the legal system.

## CONCLUSION

The Plaintiffs' state law claims are barred by the Eleventh Amendment prohibition against suing a state in federal court for alleged violations of state law. As to the Plaintiffs' federal constitutional claims, this Court does not believe that the modifications to Rule XX implicate any cognizable protected interest as to any of the various parties. Even if such fundamental rights as the Plaintiffs invoke were in fact at risk here, the Rule XX Amendments are narrowly tailored to achieve the important state interests in ensuring that the clinics remain true to their original purpose of providing legal services to those least able to afford them and in regulating the degree to which nonlawyers are able to participate in solicited cases. The Rule XX Amendments are not vague or overly broad, and they represent a constitutional exercise of the Louisiana Supreme Court's authority.

For the foregoing reasons, IT IS ORDERED that the Defendant Louisiana Supreme Court's Motion to Dismiss pursuant to Rule 12(b)(6) is hereby GRANTED, and the Plaintiffs' Complaint is hereby DISMISSED with prejudice, and with costs.