United States Court of Appeals,

Fifth Circuit.

No. 92-8178.

WORD OF FAITH WORLD OUTREACH CENTER CHURCH, INC., Plaintiffs-Appellees,

v.

Dan MORALES, Attorney General of Texas, Defendant-Appellant.

March 29, 1993.

Appeal from the United States District Court for the Western District of Texas.

Before REAVLEY, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The Texas Attorney General appeals the district court's injunction permanently prohibiting him from attempting to obtain certain records and documents from the Word of Faith Family Church ("Word of Faith") and enjoining him from further prosecuting the state court action in which he sought them. In a diligent and well-intentioned effort to resolve the competing considerations, the district court found that the Attorney General's threatened investigation violated the church's First Amendment associational and religious freedoms. Because we discern certain unsettled state law issues, the resolution of which may render moot the federal constitutional claims, we conclude that the district court should have abstained from the exercise of jurisdiction under the doctrine enunciated in *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

I.

Word of Faith is a church founded in 1976 as a Texas nonprofit corporation. Its professed beliefs apparently do not include a vow of poverty: With 12-13,000 members and some 500,000 people on its mailing list, Word of Faith grossed $65 million in revenues in 1991 on an operating budget of $50 million.[1]

On November 21, 1991, the American Broadcasting Company aired a *Prime Time Live*

---

[1]The parties have stipulated that Word of Faith is a bona fide church holding sincere religious beliefs.

television program unflattering to both the church and its pastor, the Reverend Robert Tilton (collectively, with Mrs. Tilton, the "church"). The program put forth against the church essentially four accusations: that the church was run as a sole proprietorship and that the Reverend and Mrs. Tilton therefore had direct access to church funds; that the church falsely represented that it provided financial support to a Haitian orphanage; that the church had sent out vials of holy water purporting to be from the Red Sea that in fact were from Taiwan; and that prayer requests solicited by Reverend Tilton never reached him but in fact were thrown into the garbage by the bank that processes the church's mail and deposits its contributions.

After the program aired, the church's attorney wrote to both federal and state governmental agencies, including the Texas Attorney General, and offered to meet with them and to permit review and inspection of the church's records for the purpose of satisfying the governmental agencies that the allegations made on *Prime Time Live* were false. The Attorney General declined this invitation; the United States Postal Service and the Federal Bureau of Investigation accepted.

On January 13, 1992, the Consumer Protection Division of the Office of the Attorney General faxed to the church a demand for documents pursuant to the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), TEXAS BUS. & COM. CODE ANN. § 17.41 *et seq.* Upon receipt of the demand letter, the church again requested a meeting with the Attorney General and his personnel, which the Attorney General again refused. Thereafter, pursuant to an oral request, the Attorney General's office remitted the January 13, 1992, document demand to the print and television media.

The publication of the Attorney General's document demand letter resulted in further unfavorable publicity to the church, apparently prompting it to harden its position and to decline any further cooperation with the Attorney General. Even so, the church yet again requested a meeting with the Attorney General at which counsel for the church represented, both orally and in writing, that if the Attorney General could convince his "clients" that their records should be examined, the records would be made available. The Attorney General again declined the meeting. The church's counsel then advised the Attorney General of his intention to file a lawsuit in federal court on

February 6, 1992.

On February 5, 1992, five days before the deadline specified in the January 13th demand letter, the Attorney General filed a petition *in quo warranto* in the Probate Court of Travis County, Texas, pursuant to his authority under the Miscellaneous Corporation Laws Act ("MCLA"), TEX.REV.CIV.STAT.ANN. art. 1302-5.05. The Attorney General sought not only to compel production of the records he had requested but also, as his pleadings indicated, "forfeiture of [the church's] charter and dissolution of the corporation and appointment of a Receiver to take possession of the affairs of the corporation and appointment of a Receiver to take possession of the affairs of the [church], to rehabilitate, reorganize, conserve or liquidate the affairs of the corporation," as well as a "Permanent Injunction against the [church], its officers, directors, stockholders, agents, employees, and representatives whomsoever from conducting any business of the [church], and from disposing of or concealing in any manner or any way the property or other assets of any kind or nature whatsoever of the [Church]."[2]

On February 7, the day after the probate court issued its show cause order and scheduled the matter for hearing on March 9, 1992, the church filed its lawsuit in the Western District of Texas.[3] The district court that same day issued a Temporary Restraining Order to halt the state court proceedings; on March 18, 1992, it issued its Memorandum Opinion and Order enjoining the Attorney General from attempting to obtain the church's documents and records or from further prosecuting the state court *quo warranto* proceeding. The Attorney General appeals.

II.

We review the district court's order for abuse of discretion and reverse if the order was based upon an erroneous legal standard or clearly erroneous factual findings. *Gaudiya Vaishnava Soc'y v.*

---

[2]The documents requested by the Attorney General in his original, January 13, 1992, document demand letter are summarized in the district court's published opinion. *See Word of Faith World Outreach Ctr. Church, Inc. v. Morales,* 787 F.Supp. 689, 699 (W.D.Tex.1992).

[3]On March 4, 1992, the Attorney General filed with the Travis County Probate Court his First Amended Petition and a modified document demand letter, both of which differed from the originals in certain material particulars. An important factor in our analysis, these alterations in the nature of the Attorney General's actions are discussed more fully below.

*City & County of San Francisco,* 952 F.2d 1059, 1062 (9th Cir.1990), *cert. denied,* --- U.S. ----, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). The At torney General argues that Eleventh Amendment immunity bars the action, the district court incorrectly applied First Amendment caselaw, and *Pullman* abstention compels the district court to abjure jurisdiction in favor of the state court proceeding.

It is beyond civil that the Eleventh Amendment generally bars suits in federal court by a citizen of a state against his state or a state agency or department. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Hirtz v. Texas,* 974 F.2d 663, 665 (5t h Cir.1992). The amendment does not, however, bar suits for injunctive relief against state officials. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In *Young,* the Court upheld the issuance of an injunction against the Minnesota Attorney General, foreclosing his attempt to enforce a state statute alleged to violate the Fourteenth Amendment. Employing an analogy to *ultra vires* corporate acts, the Court held that the unconstitutional statute was effectively void and therefore could not confer immunity upon a state official. Since the state could not constitutionally authorize the Attorney General's action, the Attorney General was "stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct." *Id.* at 160, 28 S.Ct. at 454. Although the logic of *Young* has not been extended to suits seeking relief in the form of money damages or "equitable restitution," *see Edelman v. Jordan,* 415 U.S. 651, 664-68, 94 S.Ct. 1347, 1356-58, 39 L.Ed.2d 662 (1974), prospective injunctive relief may still be had by way of the *Young* fiction.

The At torney General contends that the instant case fits within *Pennhurst* 's holding that, consistent with the Eleventh Amendment, a federal court may not enjoin a state official to act in accordance with state law.[4] The Attorney General argues that, in determining that the Texas DTPA

---

[4]In *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911, The Court stated that when a plaintiff alleges a state official's violation of *state* law,

> the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty

and MCLA afford the Attorney General no authority to conduct the sort of all-encompassing investigation of the church that was sought here and that the Attorney General thus was acting *ultra vires* his official capacity and therefore was subject to suit under *Young,* the district court construed state law, namely the DTPA and MCLA. Therefore, *Pennhurst* applies, and the district court had no authority to enjoin the state court proceeding.

The Attorney General's argument misconstrues *Pennhurst.* While the district court necessarily determined whether the church came within the provisions of the DTPA and MCLA (and therefore whether the Attorney General had authority to investigate the church pursuant to the powers accorded him therein), this was primarily a determination antecedent to the court's finding that the Attorney General was acting in his individual capacity for purposes of Eleventh Amendment immunity. "Under existing law, federal courts must necessarily construe local law and administrative regulations to ascertain if there is a[n] interest protected by the federal constitution." *Patchette v. Nix,* 952 F.2d 158, 162 (8th Cir.1991). The Attorney General cannot push the *Young*-like square peg of the facts of this case into the round-holed immunity recognized in *Pennhurst.*

The court's alternative holding—that even if the DTPA and MCLA *did* permit the Attorney General to conduct such an intrusive investigation of the church, the statutes would violate the First Amendment as thus applied—underlines the fact that the ultimate basis for the suit was an alleged violation of *federal* law. This fact distinguishes the instant case from *Pennhurst,* where the Court expressly noted that "[n]o one questions that the petitioners in operating Pennhurst were acting in their official capacity." *Pennhurst,* 465 U.S. at 109 n. 17, 104 S.Ct. at 912 n. 17.[5] Here, the district

than when a federal court instructs state officials on how to conform their conduct to state law. Such a result directly conflicts with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

[5]This fact, the Court added, took the facts in *Pennhurst* out of that exception to Eleventh Amendment immunity provided where a state official's actions are unauthorized by state law. "Since it cannot be doubted that the statutes at issue here gave petitioners broad discretion in operating Pennhurst, the conduct alleged in this case would not be ultra vires...." *Pennhurst,* 465 U.S. at 110-11, 104 S.Ct. at 913-14 (citations omitted). Thus, *Pennhurst* stands for the proposition that the Eleventh Amendment bars suit not, as the district court found here, where the state official's actions are alleged to be *un*authorized by state law but where state law imposes an *affirmative* duty upon the official, and it is that duty that provides the basis for the injunctive relief

court found the Attorney General was not acting in his official capacity.

Moreover, nothing in *Pennhurst* supports the proposition that merely by construing Pennsylvania law to determine whether the defendants were acting in an official or individual capacity, the district court acted contrary to the Eleventh Amendment. Anytime a court declares a state statute unconstitutional, it first must determine just what the statute means. Such was the case in *Ex parte Young;* nothing the Attorney General has advanced persuades us that this case is distinguishable from the setting of that landmark decision. As the Supreme Court has stated, it is plain "that the Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory authority or, if within that authority, that such authority is unconstitutional." *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 689, 102 S.Ct. 3304, 3317, 73 L.Ed.2d 1057 (1982). Accordingly, our jurisdiction over this case is not barred by the Eleventh Amendment.

### III.

Even though we rightfully may exercise jurisdiction in this case, we nonetheless may decline to do so in accordance with the discretionary doctrines of federal court abstention set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Pullman. Younger* abstention is generally deemed appropriate where assumption of jurisdiction by a federal court would interfere with pending state proceedings, whether of a criminal, civil, or even administrative character. *See, e.g., Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 12-14, 107 S.Ct. 1519, 1526-27, 95 L.Ed.2d 1 (1987) (federal courts may not enjoin state civil proceedings between private parties); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (extending *Younger* to state administrative proceedings involving important state interests).

Here, the district court repeatedly found that the Attorney General's sole purpose in filing the state court *quo warranto* proceeding was "to retaliate for or to deter the church and the Tiltons from exercising their constitutional rights in declining to furnish the documents and records demanded, and this "retaliation' was a major motivating factor and played a prominent role in the Attorney General's

---

sought.

decision to file the *quo warranto* proceedings." 787 F.Supp. at 694-95. This determination, the court concluded, brought the instant case within that narrow exception to *Younger* abstention in which a state court action is brought in bad faith or for a retaliatory motive. *See, e.g., Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979); *Shaw v. Garrison,* 467 F.2d 113, 122 (5th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972).

The Attorney General does not appeal the district court's refusal to abstain on *Younger* grounds, and accordingly we are foreclosed from reviewing it.[6] *Pullman* abstention, however, is addressed to the inappropriateness of federal court resolution of difficult or unsettled questions of state law and the undesirability of reaching constitutional questions that might be mooted by the application of state law. *See Pullman,* 312 U.S. at 500, 61 S.Ct. at 645. The fact that *Younger* considerations might not be implicated on appeal, therefore, does not preclude the application of *Pullman*'s differently-focused doctrine. *See Hodory,* 431 U.S. at 480 n. 11, 97 S.Ct. at 1904 n. 11.

We acknowledge that *Pullman* abstention is not necessarily proper whenever a state law question must be decided in order to reach the federal question. "Unless the state law in question is fairly susceptible of an interpretation that might avoid or substantially modify the federal constitutional question, federal courts should exercise their properly invoked jurisdiction." *O'Hair v. White,* 675 F.2d 680, 693 (Former 5th Cir.1982) (en banc); *see also County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) (*Pullman* abstention appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law").

IV.

The question thus presented is whether the statutes at issue here apply full-force to the church

---

[6]*See Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 480 & n. 10, 97 S.Ct. 1898, 1904 & n. 10, 52 L.Ed.2d 513 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system.") *Morales v. Trans World Airlines,* --- U.S. ----, ---- n. 1, 112 S.Ct. 2031, 2036 n. 1, 119 L.Ed.2d 157 (1992) ("Petitioner [Attorney General of Texas] has not argued for abstention, and the federal-state comity considerations underlying *Younger* are accordingly not implicated."). For the above reason, we do not address the issue of whether the district court correctly applied the very narrow "bad faith or harassment" exception to *Younger.*

or are susceptible of a limiting construction that would alleviate the unconstitutional burdens the district court found they imposed upon the church. The district court found that application of the DTPA and MCLA to the church—inasmuch as these authorized the Attorney General's intrusive document demand—violated the church's First Amendment rights of free association, *see NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460-61, 78 S.Ct. 1163, 1170-71, 2 L.Ed.2d 1488 (1958), and inextricably intertwined church and state in violation of the entanglement prong of the Establishment Clause test first enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

The district court's conclusion as to the DTPA's unconstitutionality as applied to the church was premised primarily upon the unconstitutionality of the Attorney General's demand for the church's membership and/or contributor lists—an obvious infringement of the First Amendment associational right announced in *NAACP v. Alabama. See Word of Faith,* 787 F.Supp. at 699-701.[7] In the district court's view, the DTPA also ran afoul of the Establishment Clause by virtue of the availability, under the statute, of injunctive relief and continuing jurisdiction to monitor the church's compliance with any injunction that might be entered against it. *Id.* at 701-02.

Essentially the same associational and excessive entanglement concerns underlay the district court's conviction that the MCLA also violated the church's First Amendment rights. The MCLA's investigative provisions authorize the Attorney General to inspect and investigate virtually any aspect of a corporation's activities, and it provides penalties for non-compliance with the Attorney General's request, including forfeiture of the corporate charter, injunctive relief to deny the right to transact business within the state, and fines and imprisonment of uncooperative corporate officers. *See id.* at 703-04.

We venture no opinion as to the correctness of the district court's decision on the

---

[7]The district court also faulted the Attorney General's document demand for its unreasonable and oppressive scope, "insofar as it requires the Plaintiffs to produce an enormous amount of documents, which do not appear to have relevance to the alleged purpose of the investigation." *Word of Faith,* 787 F.Supp. at 699 n. 10. We do not understand the court to have made a constitutional ruling on this ground. Absent such a foundation, this issue was not properly before the court and is best resolved by the state trial court in the first instance.

constitutional merits, for we need not do so in order to apply the *Pullman* doctrine to the particulars of this case. The district court, despite its apparent conviction that the consumer-fraud DTPA statute does *not* apply to the church, *see id.* at 696-98 & n. 7, nonetheless proceeded to address the federal constitutional issue *as if* the DTPA did apply. Likewise, the court found the state court receivership originally sought by the Attorney General pursuant to the MCLA to be an unconstitutional penalty as applied to the church, despite the court's recognition that the receivership provision was unavailable in the *quo warranto* proceeding. *Id.* at 703 n. 15.

In short, the unsettled questions regarding the application of state law in this case, depending upon how a state court would resolve them, could have mooted the federal constitutional issue. It is highly likely, as the district court noted, that the DTPA does not even apply to the church. Significantly, it is the DTPA that provides the Texas Attorney General with the investigative authority upon which the objectionable January 13, 1992, demand letter was predicated. A state court ruling to the effect that the DTPA does not apply to the church plainly would moot any federal constitutional claim, at least insofar as it was premised upon the application of the DTPA.

The district court did not discuss whether the MCLA properly applies to the church; we assume, *arguendo,* that it does.[8] Nonetheless, a state court might impose a limiting construction on the statute or find that the church's March 30, 1992, voluntary dissolution of its corporate form mooted the Attorney General's investigation pursuant to the statute.[9]

Lastly, the district court found that the church did not qualify as a "charitable trust" within

---

[8]Article 1302-1.03 B of the MCLA provides,

> Except to the extent that any provisions of this Act are expressly made inapplicable by any provision of the Texas Business Corporation Act, the Texas Non-Profit Corporation Act, or any special Statute of this State pertaining to a particular type of corporation, this Act shall govern (1) all domestic corporations, including without limitation those corporations heretofore or hereafter organized under any Statute of the State....

None of the excepted statutes expressly limits the MCLA's application to churches or religious corporations.

[9]In this regard, we note that the Attorney General's ability under the MCLA to dissolve the church's corporate charter and forfeit its right to do business in the state poses little threat when the church, by dissolving voluntarily, has beaten him to the punch.

the meaning of TEX.PROP.CODE ANN. § 123.001 (Vernon's Supp.1992). We voice no opinion as to the correctness of this conclusion or its concomitant, that the Travis County Probate Court thereby was deprived of the jurisdiction provided by TEXAS PROBATE CODE ANN. § 5A(d) (West Supp.1993). *See Word of Faith,* 787 F.Supp. at 704-05 & n. 18. We do note, however, that this jurisdictional question presents yet another contested question of state law with the potential to moot the federal constitutional question. *Pullman* abstention was appropriate here, where " "unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided' because "the state courts may interpret [the] challenged state statute[s] so as to eliminate, or at least to alter materially, the constitutional question presented.' " *Pennzoil,* 481 U.S. at 29, 107 S.Ct. at 1535 (Blackmun, J., concurring) (citations omitted).

One last aspect of this case likewise materially alters or even eliminates the federal constitutional question, namely the Attorney General's representations—tentatively before the district court, but with more force before this panel at oral argument—that he no longer seeks to discover the church's membership or list of contributors, to have a receiver appointed to conduct the church's affairs, or to pursue imprisonment of church officers pursuant to the MCLA. The modified demand letter and amended state court petition, both dated March 4, 1992, reflect these changes in the Attorney General's position. Taken together, they address a substantial part, if not all, of the district court's constitutional qualms, and, in our opinion, dispel the "exceptional circumstances" justifying the district court's assumption of jurisdiction. *See Word of Faith,* 787 F.Supp. at 694.

The district court's apparent conclusion that an exception to *Pullman* abstention was presented by the "great and immediate" threat of irreparable injury to the church by the Attorney General's unconstitutional actions, *see id.,* was predicated upon the original state court petition and demand letter.[10] The amended petition and modified demand letter suggest there now exists no

---

[10]In its opinion, the district court discussed both *Pullman* and *Younger* abstention before concluding that an exception applies to both. According to the court, "[t]hese circumstances satisfy, in this Court's judgment, the requirements on exceptions to abstention of irreparable injury being "great and immediate' and the conduct of the Attorney General as "bad faith, harassment or any other unusual circumstance that would require equitable relief.' " 787 F.Supp. at 694.

We have discussed, *see supra* note 6, the bad faith and harassment exception to

continuing constitutional violation sufficient to justify the exception to abstention, especially in light of the many unresolved state law issues in the case.

Therefore, abstention in this case is proper "to avoid unwarranted determination of federal constitutional questions. When federal courts interpret state statutes in a way that raises federal constitutional questions, "a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless.' " *Pennzoil,* 481 U.S. at 11, 107 S.Ct. at 1526 (quoting *Moore v. Sims,* 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979)). The muddled presentation of the issues in this case—the question of whether proper jurisdiction resides in the state trial court, whether the investigative powers provided the Attorney General by the DTPA and MCLA may be invoked against the church, and which state court petition and demand letter we should look to—should make apparent the danger of a federal court's interfering at too early a stage, only to promulgate an advisory opinion.[11] *Pullman* seems tailor-made for application to this case, where we must take care to "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Pullman,* 312 U.S. at 500, 61 S.Ct.

---

*Younger* abstention. The threat of "irreparable injury" generally excepts a case from the application of *Pullman* abstention "in the most extraordinary circumstances when fundamental rights such as voting rights are involved." *O'Hair v. White,* 675 F.2d at 694. *See also Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (facial challenge to statute under First Amendment justifies assumption of jurisdiction), *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967) (same). We have reversed the district court's refusal to abstain under *Pullman* at least in part because we believe the Attorney General's modified request presents no continuing constitutional violation justifying the "extraordinary" exception to *Pullman* represented by these cases. We do not understand the district court to have rejected *Pullman*—as it did *Younger*—on the basis of the Attorney General's bad faith; indeed, we are persuaded that prosecutorial bad faith and harassment, although constituting a recognized exception to *Younger* abstention, possess little or no relevance for *Pullman*-type situations.

[11]*See, e.g., Pennzoil,* 481 U.S. at 11 n. 9, 107 S.Ct. at 1526 n. 9 ("In some cases, the probability that any federal adjudication would be effectively advisory is so great that this concern alone is sufficient to justify abstention, even if there are no pending state proceedings in which the question could be raised.") (Citing *Pullman.*)

at 645.[12]

For the above reasons, we REVERSE and REMAND to the district court for an appropriate disposition in accordance with this opinion.

---

[12]Lastly, we are persuaded that Word of Faith has, in the Texas court system, an adequate state forum in which to obtain a resolution of the state law issues while preserving its federal constitutional claims. *See Nissan Motor Corp. v. Harding,* 739 F.2d 1005, 1010-11 (5th Cir.1984) (discussing importance of availability of adequate state forum in abstention analysis). Indeed, the potential for a ready resolution of the church's claims in state court confirms us in our conclusion that *Pullman* abstention is warranted here. *See* 17A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4242, at 60 (2d ed. 1988) ("A factor that will tip the scales in favor of abstention is if there is already pending a state court action that is likely to resolve the state questions without the delay of having to commence proceedings in state court.").