# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2025

Lyle W. Cayce
Clerk

No. 24-50984

Spirit Aerosystems, Incorporated,

*Plaintiff—Appellee*,

*versus*

W. Kenneth Paxton, *in his official capacity as Attorney General of Texas*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:24-CV-472

Before Davis, Higginson, and Douglas, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Defendant-Appellant W. Kenneth Paxton, the Attorney General of Texas, issued a Request to Examine ("RTE") to Plaintiff-Appellee Spirit AeroSystems ("Spirit"), a manufacturer of airplane parts. Penalties for noncompliance with an RTE can include revocation of the business's registration or certificate of formation and a Class B misdemeanor charge for the managerial officer refusing compliance, but the authorizing statute does not provide an opportunity for precompliance judicial review.

No. 24-50984

Spirit challenges the RTE statute as facially unconstitutional because its failure to provide an opportunity for precompliance review violates *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). The district court agreed and issued a permanent injunction enjoining the Attorney General from attempting to enforce any of the RTEs issued to Spirit or issuing new RTEs to Spirit. Because the RTE statute itself does not provide for precompliance review and the statute's "immediacy" requirement precludes precompliance review in violation of the Fourth Amendment, the district court's reasoning was correct at the time of judgment. In the period between the district court's decision and the disposition of this appeal, the Texas Supreme Court issued *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025), which read into the statute the required opportunity for precompliance review.[1] We thus VACATE the district court's judgment and REMAND for further proceedings consistent with *Annunciation House*.[2]

## I.

The Texas Business Organizations Code contains a century-old Request to Examine statute, which today provides in relevant part: "To examine the business of a filing entity or foreign filing entity, the attorney general shall make a written request to a managerial official, who shall immediately permit the attorney general to inspect, examine, and make copies of the records of the entity." Tex. Bus. Orgs. Code § 12.152. The Texas Attorney General may use the RTE statute to investigate whether

---

[1] Although the *Annunciation House* case was pending before the Texas Supreme Court during this appeal, neither party requested that we wait for the outcome of that case or certify this case to the Texas Supreme Court, even when asked at oral argument.

[2] This decision also resolves the parties' joint motion to vacate and remand.

No. 24-50984

an "entity has been or is engaged in acts or conduct in violation of: (1) its governing documents; or (2) any law of [Texas]." *Id.* § 12.153. "A record of the entity includes minutes and a book, account, letter, memorandum, document, check, voucher, telegram, constitution, and bylaw." *Id.* § 12.151.

Texas state courts have described a materially similar version of the RTE statute as a "visitorial statute[]," *Walker-Texas Inv. Corp. v. State*, 323 S.W.2d 603, 606 (Tex. Civ. App. 1959) (quoting *Humble Oil & Refin. Co. v. Daniel*, 259 S.W.2d 580, 589 (Tex. Civ. App. 1953), *cert. denied*, 347 U.S. 936 (1954)), that "give[s] the Attorney General an unlimited and unrestricted right of visitation and examination of the books and records of the corporation," *Humble Oil*, 259 S.W.2d at 589. If a corporation's managerial officer refuses to permit the Attorney General's visitation or examination, the officer commits a Class B misdemeanor, punishable by up to 180 days in jail. Tex. Bus. Orgs. Code § 12.156; Tex. Penal Code § 12.22. However, the RTE statute does not provide an opportunity for precompliance judicial review.[3]

---

[3] Although the Attorney General repeatedly refers to Requests to Examine as "subpoenas," RTEs are not statutory administrative subpoenas. Administrative subpoenas are referred to as subpoenas in the relevant statutes, *see* Tex. Gov't Code § 422.003, and can only be issued subject to an underlying court proceeding with proof of service, Tex. R. Civ. P. 176.1, 176.5. The RTE statute uses the term "Request to Examine" and does not use the term "subpoena," nor has the Texas Supreme Court used the term to describe RTEs. *Compare Annunciation House*, 2025 WL 1536224, at *1 (referring to the underlying RTE as a "record request"), *and* Tex. Bus. Orgs. Code §§ 12.151–12.156, *with* Tex. Gov't Code § 422.003 (authorizing "administrative subpoenas to investigate and prosecute offenses that involve the Internet-based sexual exploitation of a minor"), *and* Tex. Occ. Code § 153.007 (permitting the Texas Medical Board to issue a "subpoena"). Indeed, the word "subpoena" does not appear anywhere in Chapter 12 of the Texas Business Organizations Code. We therefore refer to Requests to Examine as RTEs, rather than subpoenas, as do the Texas court decisions relied on

No. 24-50984

Spirit is headquartered in Wichita, Kansas and incorporated in Delaware. Among other products, Spirit manufactures the fuselages for Boeing 737 airplanes. Spirit has one facility in Texas, near the Dallas Love Field Airport, and is registered as a foreign filing entity under the Texas Business Organizations Code. TEX. BUS. ORGS. CODE § 9.001.

On March 28, 2024, the Attorney General of Texas announced an investigation of alleged "manufacturing defects" and "concerning or dangerous incidents" involving Boeing 737 planes. The Attorney General issued an RTE to Spirit AeroSystems Holdings, Inc. ("Spirit Holdings")— Spirit's parent company, which is not itself a Texas foreign filing entity— primarily seeking documents related to Spirit's fuselage manufacturing, diversity initiatives, employee information, compensation plans, inspection procedures, and disclosures to investors.[4] The RTE included a "NOTICE" that warned, "a foreign filing entity or filing entity that fails or refuses to permit the Attorney General to examine or make copies of a record, without regard to whether the record is located in this state, forfeits the right of the entity to do business in this state, and the entity's registration or certificate of formation shall be revoked or terminated." It further advised that "a managerial official or other individual having the authority to manage

---

by the Attorney General. *See, e.g.*, *Humble Oil*, 259 S.W.2d at 583 (referring to an RTE as a "letter of request" and never using the term subpoena).

[4] The Cato Institute participated in this case as an amicus in support of Spirit and warns that the RTE in this case has impermissible "extraterritorial reach" because Spirit "is incorporated in Delaware and headquartered in Kansas." The amicus argues that some RTEs may even attempt to "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003). While questions of jurisdictional reach may arise in as-applied challenges, the case before us presents a facial challenge and thus we do not reach the issue.

No. 24-50984

the affairs of a filing entity or foreign filing entity commits an offense if the official or individual fails or refuses to permit the Attorney General to make an investigation of the entity or to examine or to make copies of a record of the entity. An offense under this section is a Class B misdemeanor."

The Attorney General initially gave Spirit Holdings until April 17, 2024, to produce all responsive documents; the production deadline was later extended to April 30. On April 29, the Attorney General indicated that it would sign a stipulation to extend the response date to allow Spirit to file this suit and to allow the parties to file cross-motions for summary judgment. The parties entered into the stipulation on May 1, 2024, and on the same day Spirit filed its complaint against W. Kenneth Paxton and Jane Nelson in their official capacities as Texas Attorney General and Secretary of State, respectively.[5] On May 13, 2024, the Attorney General rescinded the prior RTE and issued a revised RTE which stated:

> If you cannot reach agreement with the Office of the Attorney General on the scope of documents sought, you may attempt to obtain judicial review of the RTE before June 3, 2023 [sic] through a "suit for a declaratory judgment," *Humble Oil & Refining Company v. Daniel* 259 S.W.2d 580, 588 (Tex. App.—Beaumont 1953) (writ ref'd N.R.E.), or a suit for injunctive relief, *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007).
>
> In such a suit, the Office of the Attorney General will not dispute the availability of judicial review.

The parties cross-moved for summary judgment. After a hearing, the magistrate judge issued a report and recommendation recommending

_____

[5] The Notice of Appeal in this case was filed by the Attorney General and did not include the Secretary of State.

No. 24-50984

granting Spirit's motion for summary judgment and denying the Attorney General's. Applying *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), the magistrate judge recommended declaring the RTE statute facially unconstitutional on two bases: first, that the "RTE statute requires an entity's managerial official to '*immediately* permit' the Attorney General access to the entity's records," and second, that the "RTE [s]tatute . . . lacks any mechanism that would allow a [corporation] to seek precompliance review of the reasonableness of a Request to Examine." The Attorney General filed objections to the report and recommendation, including raising a standing objection for the first time. On de novo review, the district court overruled the Attorney General's objections and adopted the report and recommendation. The district court entered a permanent injunction enjoining the Attorney General from attempting to enforce any of the RTEs issued to Spirit or issuing new RTEs to Spirit.

## II.

A grant of summary judgment is reviewed de novo. *Nickell v. Beau View of Biloxi, LLC*, 636 F.3d 752, 754 (5th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence," which "shift[s] to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). "The nonmovant cannot satisfy this burden merely by denying the allegations in the opponent's pleadings but can do so by tendering depositions, affidavits, and other competent evidence to buttress its claim." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992). "When assessing whether a dispute to any material fact exists, we consider all of the evidence

in the record but refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

A trial court's grant of a permanent injunction is reviewed for abuse of discretion. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 973 F.3d 326, 333 (5th Cir. 2020); *see Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016). The district court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *BNSF Ry. Co.*, 973 F.3d at 333–34 (quoting *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018)). We "review de novo any questions of law underlying the decision." *Id.* at 334.

## III.

As a threshold matter, the Attorney General argues that Spirit "has no standing" because "Spirit was not subject to a demand for immediate compliance—it was given 'three weeks.'" He contends that "Spirit's standing is limited to challenging the RTE subpoena it received, and any allegedly-illegal features of the statute that are present in that subpoena. It does not have standing to challenge provisions, such as the 'immediate' compliance one, that do not affect it." Spirit responds that it does not challenge each provision of the statute separately; it instead challenges the unconstitutionality of three provisions, which in combination prevent precompliance reasonableness review: a lack of any waiver of the Attorney General's sovereign immunity from a lawsuit seeking reasonableness review, a lack of substantive reasonableness limitations for courts to apply, and immediacy.

The operative May 13 RTE did not provide any deferred time for compliance—it merely stated, "[i]f you cannot reach agreement with the Office of the Attorney General on the scope of documents sought, you may attempt to obtain judicial review of the RTE before June 3, 2023 [*sic*]." A sworn declaration offered by Spirit states that "the [Office of the Attorney General] refused to agree to a stipulation that would indefinitely stay enforcement of the Request to Examine pending completion of this litigation." The Attorney General does not contest this, even though he acknowledged before the district court, and again before us at oral argument, that "immediate compliance . . . [can't] be constitutionally demanded" in "mine-run" cases. *See* Oral Arg. 48:15. Further muddying the waters, the Attorney General has argued in unrelated RTE litigation that the RTE statute requires "a registered entity '[to] ***immediately*** permit the attorney general to inspect, examine, and make copies of [its] records.'" *Annunciation House, Inc. v. Paxton*, No. 2024DCV0616, Index No. 12 at 4 (205th Jud. Dist., El Paso Cnty., Feb. 16, 2024). In that same litigation, the Attorney General described allowance of any later compliance as "a matter of grace," sought to dissolve a business entity that had filed for judicial review within the provided "grace" period, and obtained a temporary restraining order. Such an interpretation is in keeping with the RTE statute, which expressly requires "immediate[]" compliance and does not provide for any deferred compliance mechanism. Tex. Bus. Orgs. Code § 12.152.

Our court has recognized that where a governmental authority "concedes that it may" enforce a particular provision, "plaintiffs have standing in the face of . . . prosecutorial indecision." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022). This is the classic case of prosecutorial indecision—the Attorney General is seeking to benefit from his grant of "grace" to Spirit while retaining the right to, at any point during the

pending litigation, impose consequences on Spirit for failure to comply with an immediacy provision he concedes is unconstitutional. Spirit has standing.

**IV.**

The Fourth Amendment "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967). In 1967, the Supreme Court began "re-examin[ing] whether administrative inspection programs, as presently authorized and conducted, violate Fourth Amendment rights as those rights are enforced against the States through the Fourteenth Amendment." *Id.* at 525. Overruling precedent authorizing warrantless administrative searches, the Court in *Camara* and *See v. City of Seattle*, 387 U.S. 541 (1967), held that the target of an administrative housing inspector "had a constitutional right to insist that the inspectors obtain a warrant to search," *Camara*, 387 U.S. at 540, and that "the basic component of a reasonable search under the Fourth Amendment—that it not be enforced without a suitable warrant procedure—is applicable . . . to business as well as to residential premises," *See*, 387 U.S. at 546.

Almost a half-century later, in *City of Los Angeles v. Patel*, respondent motel owners "brought a Fourth Amendment challenge to a provision of the Los Angeles Municipal Code that compel[led] '[e]very operator of a hotel to keep a record' containing specified information concerning guests and to make this record 'available to any officer of the Los Angeles Police Department for inspection' on demand." 576 U.S. at 412 (quoting Los Angeles Mun. Code §§ 41.49(2), (3)(a), (4) (2015)) (second alteration in original). Failure to make the records available for inspection was "a misdemeanor punishable by up to six months in jail and a $1,000 fine." *Id.* at 413. Applying *Camara* and *See*, the Supreme Court held that the respondents could bring facial challenges to a statute under the Fourth Amendment, and

that the statute in question violated the Fourth Amendment because it offered no opportunity for precompliance review. The Attorney General challenges the applicability of both holdings to this case.

## A.

The Attorney General argues that Spirit cannot sustain a facial challenge to the RTE statute because "[t]he statutory grant for the Attorney General to seek 'immediate' compliance cannot plausibly show unconstitutionality in all applications because the Attorney General almost always provides subpoena recipients weeks to comply." This reasoning runs contrary to the Supreme Court's holding in *Patel*, which explained that the test for facial challenges considers only applications where the statute actually authorizes the conduct, not those where the statute does no work:

> [W]hen assessing whether a statute [is unconstitutional in all of its applications], the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct. . . .
>
> . . . [W]hen addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.

*Patel*, 576 U.S. at 418–19. Taking the example of *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), the Court in *Patel* explained

that a facial challenge could be maintained to a statute requiring spousal notification prior to abortion even though some women did not face an undue burden because they would have notified their husbands regardless of the statute. *Patel*, 576 U.S. at 418. "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey,* 505 U.S. at 894.

Just as in *Patel* and *Casey*, the facial challenge here must be evaluated based on the applications where the statute is actually relevant, not to those where the Attorney General chooses not to use the statutory framework. In *Patel*, the City of Los Angeles could have, in practice, chosen only to use its statute in cases where a warrant could also have been obtained; this use of discretion would not have rendered the statute itself constitutional. Here, the allegedly constitutional applications where the Attorney General gives extra time to comply are discretionary and outside of the statute. As the Supreme Court has instructed, these applications are thus "irrelevant" because they are not "actual applications of the statute" and so the statute "do[es] no work." *Patel*, 576 U.S. at 419.

At oral argument, the Attorney General pressed that if he only sought an injunction to enforce an RTE, that would be a constitutional application of the RTE statute. Oral Arg. 00:20. But this pure injunction remedy does not arise from the RTE statute, which only provides two remedies for noncompliance: forfeiture of business privileges, Tex. Bus. Orgs. Code § 12.155, and criminal penalties, *id.* § 12.156. The injunction instead arises from a different section of the "Administrative Powers" chapter of the Business Organizations Code, § 12.259, which provides that "[t]he state has a right to a writ of attachment, garnishment, sequestration, or injunction, without bond, to aid in the enforcement of the state's rights created by this

chapter." It does not appear that the Attorney General raised this argument before the district court. *Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 503 (5th Cir. 2012) ("Arguments not raised in district court will not be considered absent 'extraordinary circumstances.'" (quoting *N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 916 (5th Cir. 1996), *overruled in part on other grounds by Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020))). Regardless, as Spirit notes, the Attorney General's grant of extra time to comply with the statute or seeking of an injunction under § 12.259 does not fix the core constitutional complaint: that the Attorney General can, at any time and without completion of precompliance review, apply penalties for failure to comply. It is entirely within the Attorney General's discretion to provide twenty days to comply, or to seek an injunction for compliance, and the next day revoke a company's business license and pursue criminal penalties. The Attorney General's litigation position in this case not to enforce the statute does not create a constitutional application of the statute on its face.

Finally, even if a plaintiff manages to obtain judicial relief from an RTE, the Attorney General can still seek penalties. A stark example can be seen in the history of the Texas state court case *Annunciation House*. On February 7, 2024—seven weeks prior to the RTE at issue here—the Attorney General served an RTE on Annunciation House, Inc., a non-profit entity that is organized under Texas law and registered to do business in the state. The RTE provided one day to comply. Within this one-day period, Annunciation House filed suit seeking a temporary restraining order against the Attorney General, which the 205th Judicial District in El Paso granted. *Annunciation House, Inc. v. Paxton*, No. 2024DCV0616, Index No. 3 (205th Judicial Dist., El Paso Cty., Feb. 8, 2024). The Attorney General then filed a counterclaim "seeking judicial relief to revoke [Annunciation House's] registration to conduct business in Texas, for an injunction against its

continued operation, and for appointment of a receiver." In his counterclaim, the Attorney General argued that his "power to demand access to a corporation's records 'immediately' is . . . historically well-established," and that "[t]he consequences for failure to give [the Office of the Attorney General] immediate access to records are also textually plain." The Attorney General cited to the provisions of Texas Business Organizations Code § 12.155, claiming they provided authority to dismantle Annunciation House for failure to comply with the RTE after one day, and added that the provision of a single day to respond to the RTE was a "matter of grace." It is evident from the Attorney General's own litigation positions that his grant of extra time does not itself cure the allegedly unconstitutional conduct.

Spirit can sustain a facial challenge to the RTE statute.

## B.

The Los Angeles ordinance at issue in *Patel* "create[d] an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests" because a "hotel owner who refuses to give an officer access to his or her registry [could] be arrested on the spot." *Patel*, 576 U.S. at 421. For the ordinance to become constitutional, it required an "opportunity to obtain precompliance review before a neutral decisionmaker" "absent consent, exigent circumstances, or the like[.]" *Id.* at 420. The Court explained that:

> [T]his opportunity [for review] can be provided without imposing onerous burdens on those charged with an administrative scheme's enforcement. For instance, respondents accept that the searches authorized by § 41.49(3)(a) would be constitutional if they were performed pursuant to an administrative subpoena. . . .
>
> In those instances, however, where a subpoenaed hotel operator believes that an attempted search is motivated by

> illicit purposes, respondents suggest it would be sufficient if he
> or she could move to quash the subpoena before any search
> takes place. A neutral decisionmaker, including an
> administrative law judge, would then review the subpoenaed
> party's objections before deciding whether the subpoena is
> enforceable. Given the limited grounds on which a motion to
> quash can be granted, such challenges will likely be rare.

*Id.* at 421–22 (internal citations omitted). A party is "sufficiently protected by the opportunity to 'question the reasonableness of the subpoena, before suffering any penalties for refusing to comply.'" *Id.* at 420 (quoting *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984)). A government actor "may issue an administrative subpoena without a warrant" only if the subpoena recipient can "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." *Donovan*, 464 U.S. at 415.

The RTE statute itself provides no mechanism for precompliance review and provides no internal standard for evaluating reasonableness that a court can use to comply with *Patel*.[6] The Attorney General offers three

---

[6] The Attorney General argues that *Patel* and its progeny are "materially distinguishable" from this matter because the City of Los Angeles in *Patel* claimed that "precompliance review would destroy the whole purpose of its law." The Attorney General claims that because he "admits (indeed, embraces) the proposition that RTE subpoena recipients may enjoy review before suffering penalties," this could "alter[] or even eliminate[] the federal constitutional question." This argument fails on two grounds. First, the Attorney General's mere assertion that Spirit and other RTE recipients "may enjoy" judicial review is not legally binding—indeed, the Attorney General only agreed to allow Spirit to seek judicial review after this case was already filed in district court. And the Attorney General in quo warranto proceedings challenging the Annunciation House RTE has argued that he is "immune from suit." The Attorney General's inconsistent views on judicial review prevent his "admission" from controlling the present case. His argument that a mere representation to the court can eliminate a constitutional

reasons why precompliance review is still available to recipients of RTEs: that "[t]here is abundant Texas appeals court precedent conducting merits review of RTE subpoenas"; that an RTE recipient is "***guaranteed*** judicial review whenever it decides not to comply with an RTE subpoena" because the Attorney General must initiate judicial proceedings to impose penalties on a noncompliant recipient; and that "modern Texas procedural doctrine" allows Spirit to bring an "*ultra vires* suit for injunctive relief" or a "petition for [a] protective order under the Texas Rules of Civil Procedure." Only the final opportunity for precompliance review comports with *Patel*'s requirements.

### 1.

The Attorney General first points to *Humble Oil*, 259 S.W.2d 580, *Chesterfield Finance Company v. Wilson*, 328 S.W.2d 479 (Tex. Civ. App. 1959), and *Walker-Texas*, 323 S.W.2d 603, as examples of precompliance review under the RTE statute. But none of these cases concerns the availability of precompliance review of an RTE. In *Humble Oil*, the Texas appeals court stated its "belie[f] that the visitorial statutes . . . are not in violation of the constitutional inhibitions against unreasonable searches and seizures." 259 S.W.2d at 589. However, it concluded that the visitorial statutes limited the use of copying and seizing records "to the use of copies of such records to be used as evidence in suits involving the violation of the corporation's charter rights and privileges, or violations of the regulatory

_____

question is also unavailing. The sole case he cites for this proposition concerns "exceptional circumstances justifying the district court's assumption of jurisdiction" in a *Pullman* abstention context, *Word of Faith World Outreach v. Morales*, 986 F.2d 962, 696 (5th Cir. 1993) (quotation marks omitted), not whether a statute's alleged facial unconstitutionality can be cured by an Attorney General's exercise of discretion.

provisions of some statute enacted for the purpose of controlling and regulating such corporations or violations of some penal statute." *Id.* at 589–90. The court in *Humble Oil* also held that the visitorial statutes provide the Attorney General with "the full and unlimited and unrestricted right to examination of the corporation's books and records at any time and as often as he may deem necessary." *Id.* at 589. Taken at its literal meaning, *Humble Oil*'s interpretation of the statute as allowing "unlimited and unrestricted" examination "at any time" cuts against finding that the RTE statute comports with *Patel*'s requirement of an opportunity for precompliance review by a neutral decisionmaker. Finally, the proceedings in *Humble Oil* took place after the plaintiff complied with an RTE under threat that failure to comply immediately would lead to "quo warranto proceedings . . . to forfeit its charter." *Id.* at 582–83. These were not precompliance proceedings.

Similarly, *Chesterfield* involved a question of whether the Attorney General could "mak[e] copies of appellants' records for use in suits to enjoin violations of the usury laws," 328 S.W.2d at 483, not precompliance review. And *Walker-Texas* concerned whether a business owner was required to permit immediate inspection when the Attorney General did not personally sign the RTE letter. 323 S.W.2d at 605–06. In fact, the proceeding in *Walker-Texas* was brought by the state, which sought dissolution of the corporate charter under the RTE statute for not immediately complying with the letter of visitation. None of these cases examines whether precompliance review is available as a matter of statutory interpretation or judicial procedure.

Even if the Texas courts had examined the constitutionality of the statute vis-à-vis precompliance review in these 1950s decisions, all three cases were decided well before *Patel* and therefore, to the extent any is inconsistent with *Patel*, it is superseded by *Patel*'s Fourth Amendment analysis. *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th

Cir. 2018) (explaining that "precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent" (cleaned up)). Moreover, *Humble Oil*, *Chesterfield*, and *Walker-Texas* were decided a decade before *Camara*, which established Fourth Amendment protections for targets of administrative searches. 387 U.S. 523 (1967).

**2.**

The Attorney General claims that "an RTE subpoena recipient is ***guaranteed*** judicial review whenever it decides not to comply with an RTE subpoena, regardless of whether it took advantage of the [other] pathways." "That is because the Attorney General has only two possible remedies for non-compliance"—an injunction compelling compliance and a charter forfeiture proceeding—and both "guarantee judicial review before a penalty may be imposed." According to the Attorney General, *Patel* defines "precompliance review" as review "prior to suffering penalties," and thus proceedings to impose noncompliance penalties satisfy the Fourth Amendment.

From a logical standpoint, the Attorney General's position that penalty proceedings constitute precompliance proceedings is troubling, because a recipient who loses their challenge to an RTE is then immediately subjected to penalties, without having the opportunity to comply after a court determination. In *See v. City of Seattle*, the Court explained that, under the Fourth Amendment, a party must have the opportunity to "obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply." 387 U.S. at 545. On the same day, in *Camara*, the Court rejected a regime where "only by refusing entry and risking a criminal conviction can the occupant at present challenge the inspector's decision to search." 387 U.S. at 532. Taken together, "precompliance" encompasses

everything before a recipient chooses whether or not to comply—after that point, the RTE is satisfied, or penalties begin. A penalty-related suit therefore occurs *after* a compliance choice is made; an RTE recipient in a penalty suit does not have the benefit of precompliance review in choosing whether to comply.

Without citing any authority, the Attorney General argues that it is perfectly reasonable under the Fourth Amendment to "force[] RTE subpoena recipients to put skin in the game if they refuse to comply with the subpoena and opt to litigate its validity in a defensive posture." But the Fourth Amendment does not require search targets "to put skin in the game," and such a requirement would be incompatible with the Fourth Amendment. In fact, in *Zadeh v. Robinson*, we applied *Patel*'s precompliance requirement to find "a violation of [plaintiff's] constitutional rights" when a Texas administrative agency threatened to de-license a subpoenaed doctor if subpoenaed records were not provided immediately. 928 F.3d 457, 464, 468 (5th Cir. 2019); *see also Cotropia v. Chapman*, 978 F.3d 282, 287 (5th Cir. 2020) ("Chapman . . . violated Cotropia's constitutional rights when she copied documents in Cotropia's office without any precompliance review of the administrative subpoena."). Requiring Zadeh to enter de-licensing procedures or a company to enter business revocation proceedings to obtain review would have a chilling effect—businesses would be forced to comply with unconstitutional RTEs because they could not afford dissolution as the price of going to court. The Court in *Camara* explicitly rejected such a regime. *See Camara*, 387 U.S. at 532.

Further, although the Attorney General disavows his ability to initiate a criminal prosecution under the RTE statute on the basis that Texas state law limits that power to district attorneys, he and his staff do have the ability to make arrests for refusal to comply. *See* Tex. Code Crim. Pro. § 14.01(b) ("A peace officer may arrest an offender without a warrant for any

offense committed in his presence or within his view."); *id.* § 2.12(22) ("peace officers" include "[i]nvestigators commissioned by the attorney general"). Such an arrest is authorized by Texas state law, including the RTE statute, and would prevent any pre-penalty review for recipients who refuse to comply. This is the scheme that the Court in *Patel* rejected as "creat[ing] an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass." 576 U.S. at 421. A "precompliance" regime where a recipient can only challenge the RTE by risking penalties is not a precompliance regime at all.

**3.**

Finally, the Attorney General argues that "modern Texas procedural doctrine gives Spirit at least two crystal clear pathways to precompliance review: (1) An *ultra vires* suit for injunctive relief; or (2) a petition for protective order under the Texas Rules of Civil Procedure."

We need not examine whether an *ultra vires* suit provides such a pathway because the second basis for precompliance review has, while this case was pending, been validated by the Texas Supreme Court. Under Texas Rule of Civil Procedure 176.6(e), the recipient of an administrative subpoena can "move for a protective order . . . before the time specified for compliance." TEX. R. CIV. P. 176.6(e)). Rule 176.6(d) guarantees a right to object to subpoena requests before production. TEX. R. CIV. P. 176.6(d). Although the RTE statute does not by its text incorporate Rule 176.6, the Texas Supreme Court recently held in *Annunciation House* that Rule 176.6 nevertheless provides a mechanism for precompliance review of RTEs. 2025 WL 1536224, at *24. The Texas Supreme Court also confirmed that "the term [immediately] cannot reasonably be read literally," and that the Attorney General was "not permit[ted] . . . to withhold precompliance review." *Id.*

"[S]tate courts provide the authoritative adjudication of questions of state law." *St. Joseph Abbey v. Castille*, 700 F.3d 154, 167 (5th Cir. 2012) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985) (O'Connor, J., concurring)). When we are provided "a definitive construction by a state court," we defer to the state supreme court's decision. *Id.* at 168 (quoting *Brockett*, 472 at 508). The Texas Supreme Court has definitively stated that the term "'immediately' in § 12.152 does not exclude the opportunity for precompliance review before associated penalties attach," and has defined that review as encompassing the procedures outlined in Rule 176.6. *Annunciation House*, 2025 WL 1536224, at *24. This cohesion of the statute and the rule "dispel[s]" any constitutional deficiencies present in the text of the statute alone. *Id.*

* * *

Although the district court correctly identified constitutional deficiencies in the RTE statute at the time of its decision, the Texas Supreme Court harmonized the RTE statute with other provisions of Texas law to create the opportunity for precompliance review. Consistent with 28 U.S.C. § 2106, we thus VACATE summary judgment and the injunction, and REMAND for further proceedings consistent with this opinion.

20